IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

RECEIVED

2013 NOV 14 P 4:48

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

ELIZABETH STREZA,

    Plaintiff,

v.                                    CIVIL ACTION NO. 3:13-CV-573

BANK OF AMERICA, et al.,

    Defendants.

## AMENDED COMPLAINT

1.    Your Plaintiff respectfully represents as follows: Plaintiff Elizabeth Streza, in support of its complaint against Bank of America Corporation ("BAC") and Bank of America, N. A. ("BANA") (for itself and as successor in interest by merger to BAC Home Loans Servicing, L.P. ), collectively, "Defendants," misconduct related to their servicing of my home loan, pushing for premature and unauthorized foreclosure, violation of my home owner rights and protections, pushing for premature and unauthorized foreclosures, violations of consumer protection laws, damages due to the destruction of my career in real estate that resulted in financial hardship and was forced to file for Bankruptcy and ruined my credit for ten years. All of this caused an enormous amount of emotional distress on the Plaintiff, as well as her own mother that died recently on April 18, 2013. Plaintiff seeks injuctive relief, restitution, compensatory and punitive damages for the offenses listed in this complaint, and harm caused by the Defendants.

## JURISDITCTIN AND VENUE

2.    The United States District Court for the Eastern District of Virginia, Richmond Division has original jurisdiction as pursuant to 28 U.S.C. 1332 a(1)and c(1). The Court has venue in general as per 28 U.S.C. 1391b(2), c(1), and d.

## PARTIES

1

3. Plaintiff Elizabeth Streza, is a distressed home owner with a mortgage loan obtained through Countrywide on January 24, 2006. Plaintiff also used to be a real estate agent until the real estate market fell in the aftermath of the financial collapse of 2008, but still tried diligently to work the distressed market until August of 2011, when she had to quit due to lack of real estate sales.

4. Defendant Bank of America Corporation is a diversified global financial services company and a bank holding company. It is a Delaware corporation headquartered in Charlotte, North Carolina. Defendant Bank of America, N. A. is a national banking association headquartered in Charlotte, North Carolina. Defendant BAC Home Loans Servicing, L. P. was a servicing company that had formerly been known as Countrywide Home Loans Servicing, L. P. It was Texas limited partnership with its principal place of business in Plano, Texas. It was, for a time, a wholly owned subsidiary of Bank of America, N. A. In July 2011, it was merged into Bank of America, N.A.

5. In the original complaint Plaintiff brought suit against Countrywide as well, the original servicer of the Plaintiff's loan. If there are no objections, I would like to remove action brought against Countrywide Financial Corporation, a financial services company headquartered in Calabasas, California, and three of its subsidiaries, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank, FSB (collectively, with Countrywide Financial Corporation, "Countrywide"). If there are objections, I will restate the origination misconduct on my loan by Countrywide and any related matters. On April 23, 2009, the Office of the Comptroller of the Currency approved Countrywide Bank, FSB's ("CWB") request to convert its charter back to that of a national bank and the request by Bank of America, N. A. to them immediately acquire CWB by merger. These transactions were executed on April 27, 2009, as a result of which CWB ceased to exist. Bank of America, N. A. is the successor in interest to CWB. The business of BOA Corporation and its subsidiaries and affiliates includes origination and

servicing of mortgage loans. Collectively the Defendants identified in this paragraph are referred to here as the "Defendants."

## BACKGROUND (relevant to this case)

### A.     The Single Family Mortgage Industry

6.      The single family mortgage industry consists of financial services and other firms that originate, underwrite, securitize, and service mortgages for residential properties designed to house one to four family dwellings.

7.      Mortgage origination is the process whereby a lender loans money to a borrower and receives a security interest in property, through a mortgage or comparable device that secures the loan. Origination generally includes all the steps from receiving a loan application through disbursal of the loan proceeds.

8.      For more than thirty years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust, and interests in the trusts have been sold to investors that own interests in payment streams generated by principal and interest payments by the borrowers.

9.      After mortgages are originated, a "servicer" is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from mortgagors; applying payments made in an agreed-upon order to the mortgagor's indebtedness; distributing payments after allowable deductions to the investment trust entities for distribution to investors; making advances to cover delinquent mortgage payments and other costs, such as the costs of protecting and maintaining properties that collateralize mortgage loans when mortgages fail to do so; pursuing collections from delinquent mortgagors;  and pursuing either loss mitigation or foreclosure, as

appropriate, to minimize the loss to investors and others when mortgagors become delinquent on mortgage payments.

**B.      United States' Stimulus / Rescue Efforts**

10.     Beginning in the fall of 2008, the federal government instituted several measures to try to stabilize the housing and credit markets and assist troubled homeowners.

11.     In October of 2008, the Emergency Economic Stabilization Act of 2008 (EESA) was passed to promote stability and liquidity in the financial system Among other things, EESA authorized the Secretary of Treasury to establish the Troubled Asset Relief Program (TARP). TARP funds were used, in part, to promote various mortgage loan modification programs.

12.     The Making Home Affordable (MHA) Program. In March 2009, the United States launched the MHA Program. The MHA Program included the Home Affordable Modification Program (HAMP), a Treasury program that uses TARP funds to provide incentives for mortgage servicers to modify eligible first-lien mortgages.

13.     HAMP uses incentive payments to encourage loan servicers and owners of mortgage loans or bonds backed by mortgage loans to modify eligible first lien mortgages so that monthly payments of homeowners who are in default or at imminent risk of default will be reduced to affordable and sustainable levels.

14.     The Home Price Decline Protection Incentives (HPDP) initiative. The HPDP initiative is designed to encourage modifications of loans in markets hardest hit by falling home prices. The HPDP initiative provides investors with additional incentives for loan modifications on properties located in areas where home prices have recently declined and where investors are concerned that price declines may persist.

4

15. The Principal Reduction Alternative (PRA). PRA is designed to encourage the use of principal reduction in modifications for eligible borrowers whose homes are worth significantly less than the remaining outstanding principal balances of their first-lien mortgage loans. It provides investor incentives to offset a portion of the principal reduction.

16. The Home Affordable Unemployment Program (UP). UP is designed to offer assistance to unemployed homeowners through temporary forbearance of a portion of their mortgage payments.

17. The Home Affordable Foreclosure Alternatives Program (HAFA). HAFA is designed to provide incentives to servicers, investors, and borrowers to utilize short sales and deeds-in-lieu of foreclosure for HAMP-eligible loans in cases in which the borrower can no longer afford to stay in their home but want to avoid foreclosure. Under this program, the servicer releases the lien against the property and the investor waves all rights to seek deficiency judgment against a borrower who uses a short sale or deed-in-lieu when the property is worth less than the outstanding balance of the mortgage.

18. The FHA Refinance for Borrowers with Negative Equity (FHA Short Refinance) Program. This program is partially supported by TARP funds and allows servicers and investors who write down a borrower's principal balance on a non-FHA-insured, existing, underwater, first-lien mortgage loan in connection with a refinancing to obtain FHA insurance on the newly refinanced mortgage. Treasury has provided a TARP-funded letter of credit for up to $8 billion in loss coverage on these newly refinanced FHA loans.

19. Housing Finance Agency Hardest Hit Fund (HHF). HHF is a TARP-funded program designed to fund foreclosure prevention programs run by state housing finance agencies in states hit hardest by the decrease in home prices and in states with high unemployment rates. Eighteen states and Washington, D. C. have received approval for aid through this program.

20. Fannie Mae (Federal National Mortgage Association), was founded in 1838 during the Great Depression, as part of the New Deal. It is a government sponsored enterprise (GSE), though it has been a publicly traded company since 1968. The corporation's purpose is to expand the secondary mortgage market by securitizing mortgages in the form of mortgage backed securities (MBS), allowing lenders to reinvest their assets into more lending and in effect increasing the number of lenders in the mortgage market by reducing the reliance on locally based lending institutions. In reality, however, it looks like the local banking and lending institutions have done a better job at maintaining the local economies and servicing customers than the major banks.

## FACTS

21. None of the above mentioned "rescue effort" programs have been offered to me. In the case where a loan modification was presumably offered to me, was nothing that was promised to me. On June 12, 2010, I traveled with my mother (who was sick at the time) to Atlanta, GA to a Save the Dream Event sponsored by the Neighborhood Assistance Corporation of America (NACA), in order that I might seek a loan modification face to face with a Bank of America representative. Mom and I were there two days, while I joined the ranks of about ten thousand troubled mortgage home owners, all trying to get their five minutes with their rep. Not all the participants were guaranteed a meeting with a rep. There were just too many people to help that came from all over. I pleaded that I will have to return soon, as mom was not well in our hotel room (just down the street from the event, so I could check on her, and she could call me), and the transmission inside my vehicle that was just fixed eight months prior to the trip, blew up about 100 miles before we reached Atlanta, GA. AAA (thank God for them) transported mom and I to our hotel downtown Atlanta, GA. Everything seems correct on the paperwork from Atlanta, except the document signed by the Bank of America was incorrectly dated 5-13-2010. Although the event lasted three days, our meeting was in fact on June 13, 2010. It was just a typo by Bank of America. Please **see Exhibit A.** The document signed by the Defendants' representative, says that she would order the determination of value of my property. That was in order to confirm the lower value of my home compared to what I owed on it, in order to qualify for a principal reduction, therefore reducing my payment to something I could afford with my lower income at the time. I provided all the documents they requested, however, defendants never provided me with any information of an appraisal. In fact, it is customary for the appraiser to call the home owner to make an appointment to come see the house inside and out, and that never happened. When I tried to contact BOA repeatedly, I got no answer.

22. Plaintiff also tried to get help through NACA, however, they were going through disputes with the Department of Housing (HUD) during that time, Summer of 2010, and HUD cut off their financing, which may explain why they could not help me at the time. The dispute

between NACA and HUD got settled out of court, but only due to a lawsuit a year later, in July of 2011, and that is when I learned about this as well. Then, NACA was back in business to help distressed homeowners. What is significant about this dispute between NACA and HUD, which affects me in this case is that, the Defendants, should have known from working and servicing loans for Fannie Mae, that Fannie Mae never does principal reductions on mortgages, according to documents obtained from NACA at a press conference in Washington DC in July of 2011. NACA called me and invited me to go to the press conference to help advocate a solution to my mortgage problem. Please see **Exhibit B** from NACA which explains the devastating effects of Fannie Mae backed loans. After the press conference, I realized why the promise of a principal reduction by the Defendants to make my loan work was not taking place because Fannie Mae would never allow it. Other mortgage companies worked greatly on helping distressed home owners; however, I was stuck with Fannie Mae, that wouldn't cooperate. However, the Defendants were not honest in telling me the opposite of what was true; they gave me hope for an affordable loan modification based on the lower value of my home, which they were going to confirm by ordering an appraisal, when all along they knew they could not deliver because of Fannie Mae. I drove all the way out to Atlanta, GA, took my sick mother with me, stayed in a hotel for two days, had car troubles. It was the very last long distance trip for my mother, as she could not tolerate long trips anymore. She died, God rest her beautiful soul on April 18th, this year, 2013. The trip was very hard on her, and expensive on me, as Atlanta is approximately 600 miles from home, 1200 miles round trip. Mom and I returned home in a rental car, as I could not afford to fix the broken transmission on my vehicle that took place on our trip to Atlanta, and had no access to my local reasonable mechanic. All that work, provided every single document they ever asked for, and broke their promises to reduce principal on my mortgage to make my loan affordable. I was waiting the whole time for the Defendants to order their appraisal. I even made comparable properties available to them from the realtor.com website. Please see **Exhibit C.** Instead of working with me, the Defendants pushed to foreclose, while I was waiting, and believing that the modification they really promised me will come through some time, and never did. The Defendants did not get qualified people to call back with answers. I only figured out a year later from NACA at the press conference in Washington, DC, that the Defendants never meant what they said. All of this points to a breach of set of agreements and promises that the Defendants made and did not go through with it. Other big issues with the Defendants" proposed loan modification was that all of a sudden it arrived at my house with a proposed 40 year mortgage. That was never discussed before by the Defendants or by NACA. We only talked about a 30 year loan, and all the calculations to get a lower payment was made for a 30 year loan. That is what I was told. However, when documents were prepared and signed at the speed of lightning, because everyone only had five minutes with their representative from Bank of America, who knows what really was going on? And the surprise Bankruptcy Disclosure Rider **Exhibit D**, made me realize it was asking me to give up some of my rights as a consumer. I called repeatedly to get answers to my questions, but there were no answers. Just to wait until we get an appraisal back to see the value come in on order that I might qualify for a lower payment that I could afford.

    23.    While Plaintiff had every good reason to believe that efforts were being made to obtain a loan modification, the Defendants were taking steps to do an unauthorized foreclosure

on or about October 21, 2010. All the required items listed as necessary by the Bank of America representative in Atlanta, GA for Plaintiff to provide were provided immediately to the Defendants; the hardship letter, 2 years tax returns, and a recent utility bill. However, no appraisal was done by the defendants to get a current value of my home. Therefore, the Defendants are in breach of their agreement to provide the loan modification that they had promised to the Plaintiff.

24. There were two attempts to conduct unauthorized foreclosures by the Defendants, and both did not have proper 30 days acceleration notices, violations as per the Deed of Trust in paragraph 22, **Exhibit E**, and in violation of Code 15 U.S.C. 1692e(10). The first was on or about October 21, 2010. The only thing that stopped the scheduled foreclosure was the robo signing scandal that the Defendants were also involved in and they were ordered to put a temporary moratorium on the foreclosures. The second attempt to foreclose on my home was on March 2, 2012. On February 15, 2012, Plaintiff received a foreclosure notice from Shapiro and Burson LLP, dated February 13, 2012, **Exhibit F**, notifying her that they planned to foreclose on Plaintiff's home on March 2, 2012. From the time the notice was dated (not received), to the actual planned date of foreclosure, it was only 18 days. Actual notification was only 16 days from the date of receipt of notice. That may be more than enough for an experienced attorney to react with a plan of action, but not for someone like the Plaintiff that had no idea of what to do, and she was extremely stressed to come up with a plan to save her home because she has no place to go otherwise. I, the Plaintiff, felt as if my heart stopped during that stressful week, and it was not easy to recover emotionally from that. To make matters worse, when finally a court date was selected by the Defendants, because Plaintiff filed for an injunction, they did not notify me, the Plaintiff.

25. There are efforts under way to track the advertising schedule of the foreclosure sales in order to see the Defendants' compliance, or lack thereof with Va Code Ann 55-59.2. Plaintiff would like to ask the court to have the Defendants make the advertising schedules (for the foreclosures) available to the court and the Plaintiff. The Plaintiff already asked the local paper, the *Independent Messenger* for such records, and I will share them with the court and the Defendants when I receive them. However, Plaintiff has no way of knowing if the Defendants advertised outside the Plaintiff's area. That is the reason for the request.

26. In the United States of America v Bank of America Corp, et al (case number 1:12-cv-00361-RMC), more commonly known as the National Mortgage Settlement Suit, in the settlement term sheet, Exhibit A ( theirs not mine Exhibit A), was often not supported by existing laws, however it was more than supported by common sense. Examples:

27. "*Third Party Provider Oversight (pg A-12 ). A. Oversight Duties Applicable to All Third Party Providers. Servicer shall adopt policies and processes to oversee and manage foreclosure firms, law firms, foreclosure trustees, subservices, and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by or on behalf of Servicer that provide foreclosure, bankruptcy or mortgage servicing activities (including loss mitigation) (collectively, such activities are "Servicing Activities" and such providers are "Third-Party Providers........*" This is extremely important as there was no organized effort between the Servicer, the Defendants and third parties. Shapiro and Burson, LP, of Virginia Beach, who was hired by the Defendants, did a lot of unauthorized things, that

the Defendants are now responsible for. They are famous in our area of doing unauthorized foreclosures without proper notices or communication, and they did me the same way too.

28. "*Quality Assurance Systems Review. (pg A11). Servicer shall conduct regular reviews, not less than quarterly, of a statistically valid sample of affidavits, sworn statements, Declarations filed by or on behalf of Servicer in judicial foreclosures or bankruptcy proceedings and notices of default, notices of sale and similar notices submitted in non-judicial foreclosures to ensure that the documents are accurate and comply with prevailing law and this Agreement*" This new agreement, mortgage companies are no longer allowed to proceed without proper documentation like it happened to me. In fact, there was a big judgment against them because of these unfair dealings

29. There are now loss mitigation requirements, mandated by the Federal Court, which did not exist before, and the Defendants did not feel they had to follow any specific procedures before the judgment on this class action lawsuit, and people could wait years for their modification. Please see **Exhibit G** for the problems that Plaintiff shared in common with the National Mortgage Settlement suit. It is taken from the original complaint filed on August 23, 2013.

30. At the last count, 11 million homeowners have lost and/or are losing their homes. All together, there are 27 million mortgages in trouble (half of all the U. S. mortgages) because of the government housing policies heavily lobbied by the mortgage market players, including the Defendants. Currently there are 65 million American adults that do not qualify to purchase a home (about twice as many as there were before the Commodities Futures Modernization Act of 2000), and about half of them, have bad credit because of the hardships caused by the housing market crisis, such as getting behind on their payments, and foreclosures and short sales. The mortgage companies expect their reo listing real estate agents to do all their dirty work, including the evictions of families with small children. It is extremely disturbing to look at the facts, but this is the real estate business that mortgage companies, like the Defendants has turned it into. These mortgage companies eliminated the Plaintiff's career because she refused to park her conscience at the door, and also by badly hurting the credit scores of 27 million of Americans, excluding them from being able to purchase a home right now, even if they have good incomes. The Defendants left crumbs for real estate agents to fight for, since there became far less business, and it mainly involves taking people out of homes as in foreclosures and short sales, instead of putting people into homes. Then, these mortgage companies, and their investors, including the Defendants, give the purchasing investors that buy those homes, the deals that the Defendants would not give half those breaks to the home owners that have, or have had the vested interests in their homes. Another way that the mortgage companies have made the real estate industry difficult is that, it now takes far longer, and much more red tape for a buyer to purchase a home because of the lengthy mortgage process (that is even comparing it to before the deregulation of the Commodities Futures Modernization Act of 2000), therefore, a realtor has to work far harder and much longer, even for the rare client that does qualify financially with great credit to purchase their home. At the onset of the mortgage crisis in 2008, there were almost 1.4 million realtors in the United States. That dropped to close to 900,000. Unfortunately, the ones that are still working are getting far less business than before, mostly they have to count on bank foreclosures business and cash buyers for business which has not only limitations, but conscience related objections. And most agents have other jobs now. They probably have to, in order to pay bills and the fees and dues.

31. In 2008, during the presidential election campaign, President elect, Barak Obama, promised to overhaul the troubled mortgage system, and provide relief to the millions in jeopardy of losing their homes. He also promised that while he would start as the President, he would order a moratorium on foreclosures until things got fixed. We all know now that it was just another broken campaign promise. It took only one day, September 18, 2008, for the major financial companies to get 800 billion for their bailout. Meanwhile, the American people are still being foreclosed on five years later. If help happened in time, perhaps our economy may have recovered by now. That is why it is sad that Plaintiff has no other alternatives but to come to this honorable court to plead for help. There is a list of experts that are being contacted on the current situation which Plaintiff believes that if they could provide a statement or declaration to this court, it might clear up this case when seeing what happened prior to the 2008 market crash, the events behind the scenes by the mortgage companies which lead to it. Please see **Exhibit H**. Also attached is an essay that this list of experts have put together in a documentary called Generation Zero, that explains exactly what happened that lead to what is happening today to people like the Plaintiff caused by the large financial companies, including the Defendants. There may be other consumers with troubled mortgages being serviced or having been serviced in the past by the Defendants who may be willing and able to testify as to what happened to them.

**PRAYER FOR RELIEF**

32. Before Plaintiff asks this honorable court for relief, I would like to ask the court, as well as the Defendants that they would treat me the same way as if I were their daughter, mother, or sister. What should be the just relief and compensation for your beloved one, if such unfortunate set of events happened to them? Plaintiff's first goal is that she wants to be very fair and reasonable. What is the rehabilitation of one's life worth?

33. To rehabilitate the Plaintiff's professional life in order that she might have another lucrative career it would take education costs of $40,000 to $100,000. That is how expensive our colleges and Universities have become. Those costs do not include expenses for the next 2-3 years, duration depending on the exact program enrolled. The expenses would cost as much or more than the education costs.

34. Plaintiff's best year in her real estate career, which lasted from July, 2001 to August, 2011, was in 2005 when her income was $70,000. If even half of that was considered for lost wages compensation, and if multiplied by five years, it would be $175,000. I pray the court will rule in its best Godly judgment, if I deserve lost wages, however, damages done to my career by destroying my income can only be counteracted by providing me, the Plaintiff, with education costs and expenses while in school in order to facilitate a new career and a livable future, like I used to have.

35. Wherefore, the Plaintiff respectfully requests the court that judgment enter in her favor against the Defendants as follows.

36. The relief Plaintiff is seeking is $350,000 in compensatory damages to pay for the reconstruction of my career life, and all the efforts and expenses made by the Plaintiff in order that she might receive the loan modification promised to her. That is also to include the costs of education and expenses for a lucrative career like the Plaintiff used to have, and lost wages. As far as punitive damages for emotional stress, caused to me by the unauthorized foreclosure activities, breach of contract to not come through with the promised loan modification, I will trust the court to be under divine guidance for that because I am not a good judge of that. May it be what is right. If I may point out, I also have the burden of the Bankruptcy that I had to file in 2012 because of the financial ruin.

37. Further, as relief, Plaintiff is also seeking a loan modification based on the current value of her home. To get the real value, Plaintiff asks the court to order an appraisal through a local appraiser in Greensville County knowledgeable in local values of homes in the Greensville County area.

38. Further, Plaintiff asks this honorable court for injunction of any and all proceedings of foreclosure against her subject property, at 2244 Orion Rd., Jarratt, VA 23867. This injunction to be imposed to all Defendants, and any other servicing company that the Plaintiff's mortgage loan would be assigned to, including Green Tree Mortgage Company, a new servicer on the horizon.

39. For all other further relief as this court deems just and proper under the circumstances.

40. Wherefore, I pray that this honorable court consider this case with careful and heartfelt consideration, as the life of the Plaintiff has been forever changed by the Defendants.

Respectfully Submitted,

*Elizabeth Streza* (signature)

ELIZABETH STREZA

Plaintiff, Pro Se

2244 Orion Rd.

Jarratt, VA 23867

434-378-3880

estreza@msn.com

*Elizabeth Streza* (signature)

11-14-2014

*13*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of November, 2013, I filed a true copy of the foregoing at the United States District Court for the Eastern District of Virginia, Richmond Virginia, and sent complete copies via U.S. Mail to the following:

Sarah K. McConaughy

McGuire Woods LLP

World Trade Center

101 West Main Street

Suite 9000

Norfolk, VA 23510-1655

757-640-3710 phone

757-640-3939 fax

smcconaughy@mcguirewoods.com

Counsel for the Defendants

*[signature: Elizabeth Streza]*

Elizabeth Streza

2244 Orion Road

Jarratt, Va 23867

434-378-3880

estreza@msn.com

Pro se Plaintiff

*11-14-2014*